UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------
                                          )
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
              Plaintiff,                   )        Criminal Case No. 11-CR-352-03-BAH
                                          )
       v.                                 )        DEFENDANT JAMES POGUE'S
                                          )        SENTENCING MEMORANDUM
JAMES POGUE,                              )
                                          )
              Defendant.                   )
                                          )
-------------------------------------------
```

CONTENTS

I.    Introduction and Recommendation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   Section 3553(a)(1) – History and Characteristics of the Defendant  . . . . . . . . 4

      A.    All of His Adult Life, Jim Pogue has been a Ship's Engineer.  He is
            Technically Superb, Diligent and has a Passion for Mechanical Work
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    In 2010, Jim Pogue Left the Sea and Returned Home to Care for his
            Mother . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.    Jim Pogue as a Family Man  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.    Section 3553(a)(6) – ". . . to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct. . ." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.    For Cases in which Confinement was Ordered, and for which Factual Information is Available, an Apparent Aggravating Factor was Obstruction During a Coast Guard Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    In Five Other Cases, No Confinement was Ordered Although the Defendant Engaged in Obstruction after a Coast Guard Investigation Began. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    C.    Significantly, in Section 3553(a)(6), Congress Directed that Courts Focus on "Similar Conduct" Rather than on the Offense of Conviction, and on National Sentencing Patterns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.    Section 3553(a)(4)(A) – the Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . 24

    A.    Factors Which Warrant a Sentence Below the Calculated Offense Level 24

    B.    Objections to Enhancement under § 2J1.3(b)(3) and §3B1.1(c) . . . . . . 27

V.    Section 3553(a)(2) – Need for the Sentence to Reflect Seriousness of the Offense and Provide Deterrence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## I.   INTRODUCTION AND RECOMMENDATION

James Pogue will be sentenced upon the jury's verdicts on Counts Two and Three of the superceding indictment (ECF No. 22).  On the former, the jury found that he violated 33 U.S.C. § 1908(a) and 33 C.F.R. § 151.25 by "knowingly maintained an Oil Record Book that failed to account for internal transfers of oily bilge waste from machinery spaces to other areas of the ship." ECF No. 207, at 6.  On the latter, the jury found that he 18 U.S.C. § 1519 by, "with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of the United States Coast Guard, did knowingly conceal, cover up, falsify, or make a false entry in the Oil Record Book for the *F/V San Nikunau* by falsely stating that required pollution prevention equipment had been used when it had not." ECF No. 207, at 8. The jury found Mr. Pogue not guilty on Count One[1] and did not find against Mr. Pogue on additional specifications submitted to it on Counts Two and Three.

Based upon our analysis of sentencing factors in 18 U.S.C. § 3553(a), we recommend a sentence of probation and a fine of $5,000.  That sentence is consistent with the requirement of § 3553(a)'s requirement of a sentence "sufficient but not greater than necessary" to accomplish the goals of sentencing.  In the following pages, we address those statutory sentencing factors.

---

[1] Mr. Pogue requests that the written judgment to be entered include a judgment of acquittal on Count One.

## II.     SECTION 3553(a)(1) – HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.     All of His Adult Life, Jim Pogue has been a Ship's Engineer.  He is Technically Superb, Diligent and has a Passion for Mechanical Work.

To supplement the information contain in the presentence report, we offer the following information.  As reflected in defense trial exhibit no. 101, Mr. Pogue has worked aboard tuna boats since he was in high school.  He was the youngest person to obtain a chief engineer's license.  His passion for machinery came from his father, who also was a chief engineer aboard tuna boats.  From the time that Jim and his brother Bill were young, their father taught them mechanical engineering and about the pride which comes from making systems work well.  Jim followed his father to sea, while his brother Bill became an aerospace engineer.  (Exhibit 1, letter from William Pogue.)

When he is not at sea, Jim immerses himself in other mechanical work.  His hobby is rebuilding cars and trucks that are "junkers."  He drives a recently restored 1947 Ford, and as reflected in the presentence report, at ¶ 86, he has a number of cars and trucks "in progress."  The family farm provides him a place to store and work on his vehicles.

Since he returned home to care for his mother, he has lived on his savings and earned a bit of money by providing mechanical services for farming and logging equipment, and on vehicles for people in his community.  Both ashore and at sea, he is respected for his competence and level of effort.  Dr. Al C. Truehart is a California chiropractor who has known Jim for more than twenty years.  In his letter to the Court (Exhibit 2) he related:

> I met Mr. Pogue through his brother, Bill Pogue, when Jim was in his twenties. At the time he was home from his job at sea. He was visiting with his brother in Long Beach, California and doing mechanical work on cars and machinery around the port area as side jobs. I was present on many occasions when Jim was negotiating for materials or labor and was

4

impressed by how he always treated whoever he was dealing with, respectfully and fairly. He would go out of his way to make sure that every transaction was evenhanded to not only himself, but to whoever he was dealing with. I never saw an instance where he took advantage of someone he was negotiating with or in any way acted dishonestly.

Until the *San Nikunau* was sold to Sanford, Ltd., Mr. Pogue worked on U.S.-flagged boats of the San Diego tuna fleet.  His boats were managed by William M. Sardinha, as described in ¶ 83 of the presentence report.  In his letter to the Court (Exhibit 3) Mr. Sardinha described Jim's "diligence to detail and making sure the vessel was operating in all respects."

The *San Nikunau's* first officer, Moana Tai Fredricsen similarly described Jim's level of effort aboard the *San Nikunau*:

> Q. Of those four Chiefs, is Mr. Pogue the one who's spent the most time aboard while you were there?
>
> A. Yes.
>
> Q. From your observations as the First Officer and as the Port Captain, how does Mr. Pogue's effort compare to the other Chiefs that have served with you?
>
> A. He's over 110 percent, it doesn't -- you know, it's extremely amazing, excellent, excellent person.
>
> Q. Out-performs the others?
>
> A. Definitely a lot, yes.

ECF No. 174-1, at 130-131.

On two documented occasions, Mr. Pogue risked his life for the safety of his vessel and its crew.  One incident is described by Mr. Sardinha (Exhibit 3):

> I remember a time (about the year 2000) when docked next to Star-Kist in Am Samoa. Fire was coming out of the stern and Jim did not hesitate, he jumped in a fire suit with a mask. grabbed a fire extinguisher and said follow

me. When Jim and I walked into the rear compartment behind the lower engine room all you could see was smoke and flames in the distance. As he entered through the door he asked me to close it behind him and keep an ear open for him. It may have been only 5 minutes but to me it seemed like an hour; Jim reappeared and said that the fire is out.

A later incident was described by Manual Gulliman in his deposition testimony, admitted at trial.  ECF No. 176-1, at 25. The *San Nikunau's* pipe alley flooded.  There was about four feet of water in it when Jim Pogue jumped in, swam its length and dove underwater to close a valve and stop the flooding.


   B.   In 2010, Jim Pogue Left the Sea and Returned Home to Care for his Mother.

   Jim's mother is eighty-four years old, and suffers from dementia and chronic health problems.  She can no longer live alone, but wants to live out her remaining years on the farm she and her late husband built.  To make that happen, Jim Pogue returned home in 2010 to care for her.  His efforts are described in letters from Mrs. Pogue's medical provider (Exhibit 4), his brother (Exhibit 1), Dr. Truehart (Exhibit 2), Lori Rigsbee (Exhibit 5),  Erin LaRue (Exhibit 6), Cyndi Walder (Exhibit 7) and Eric Nay (Exhibit 8).

   Ms. LaRue, who has been a home health care provider, observed:

   At this time, Jim's whole world revolves around caring for his aging Mother! She has fallen numerous times, breaking her wrist the last time. Her memory is failing as Alzheimer's sets In. I used to be employed as a home health care provider, and try to give Jim pointer's as I can. Jim strives to take excellent care of his Mom, making sure he offer's her a good, and balanced diet. He takes her out every week to the local bakery for her favorite bread, and out to lunch. Last weekend, we took his Mom on an hour and a half train ride. His mother depends on Jim for her very existence. and Jim does all he can to keep his Mother comfortable.

Eric Nay has known Jim and his mother since 2006.  He considers them "part of our family."  His observations of the care Jim provides his mother speak volumes.

Margit's health and mobility have certainly declined significantly since I first met her. Her wish is to remain in the home that her and Jim share and that is only possible through Jims [sic] daily efforts. Jim is very caring and shows great concern for his mother, as any good son should. Sometimes Margit acts as though she is not interested in eating. Jim will set a small snack by her bed and she will pick at the food until its gone. Sometimes Margit acts as though she doesn't want to go outside. Jim will set out her jacket and then go outside. It won't be long and then Margit is outside getting the daily exercise that she needs. Jim doesn't argue with his mother, just lets her think that it was her idea. She needs that kind of encouragment [sic] and care. He makes sure that she gets up and moves around, keeps her mind stimulated, and fixes her several small snacks in addition to her meals. The attention that Jim pays to her is invaluable, both physically and mentally. Her needs are great and Jim is dedicated to meeting those needs. I believe that her son's selflessness is sustenance for Margit, especially when I hear her call him "Jimmy".

Cyndi Walder is a close family friend, who notes the improvement in Mrs. Pogue under Jim's care.

When they brought her back to her home in Northern Idaho, there was an immediate and obvious change in her wellness. This would be due to both location and the care that Jim provides. He has the patience that is required and the natural understanding of her wants and needs. Over time his care has resulted in an emotionally healthy women who is satisfied with the life that they have at her home.

C.      Jim Pogue as a Family Man

Jim Pogue married in 1990 and was divorced in 1999.  He has two children and a step-son. Letters from his son and step-son may be found as Exhibits 9 and 10, respectively.  Wade Boland, age twenty-nine, is Jim's step-son.  They have a close relationship.

. . . Jim has raised me like one of his own my whole life. Even though my mother, Kit, did not stay married to Jim, we have kept in close touch over the years by phone and visits. Jim is my father and will always be so.

*      *      *

7

He has always been there for me when I have needed him and for that I am
forever grateful.

Jim's eighteen-year-old son William observed:

My father and i [sic] have always been very close throughout my whole life.
Although he is away a lot he does his best to stay in contact with me and my
siblings and tries to see us as much as he possibly can. We do the same
thing back. My father has always been there for me even a few thousand
miles away and he can still help me.

His ex-wife, Kathryn, in her letter to the Court (Exhibit 11), confirmed what the children said

and notes that even after their divorce, Jim has provided continued financial support for

her, above and beyond paying child support.

Jim's nephew, Trevor Pogue described him as a man who "knows not only the skills

necessary for a lively existence, but also the manners in which to teach those skills to

others well and with patience. This is his talent."  Exhibit 12.

Jim's caring is not limited to his own family.  Blythe Nay has known him since 1997,

and wrote, in Exhibit 13:

Jim not only eagerly helps others when he is asked to do so, he seeks
opportunities to assist without waiting on a cry for help. He seems to live his
life based on the premise of the Golden Rule. He has a passion for sharing
what he has learned with others, especially children; his patience in doing so
amazes me. . . .  He has a profound impact on those around him and on his
community in general.

Her brother commented (Exhibit 8):

I have also been impressed by Jim's patience with my sons, nieces, and
nephews. He is always willing to share his knowledge on motors, tools,
fishing, etc. He always encourages them. There aren't many men that I know
who would so willingly give of their time and attention to 8-14 year olds who
aren't blood relatives.

III.    **SECTION 3553(a)(6) – ". . . TO AVOID UNWARRANTED SENTENCING DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT. . . "**

To avoid unwarranted disparities in sentences imposed on persons "who have been found guilty of similar conduct," one must first identify prosecutions for similar conduct. We endeavored to identify cases in which vessels' chief engineers were sentenced for MARPOL-related offenses, during the five-year period beginning January 1, 2008. We found thirty-three cases.[2]  Thirty-two involved chief engineers on ocean-going cargo or tanker ships, substantially larger than the *F/V San Nikunau.* The other case involved a U.S. Coast Guard cutter.  In Exhibit 14, we have compiled information identifying each case, the charges and sentences imposed.

The longest sentence imposed in any of the cases was six months confinement. In five cases, the defendants were committed to the custody of the Attorney General, for terms between one week and six months.  In five other cases, a special condition of probation required community or home confinement for periods of one week to six months, some with credit for time spent awaiting sentencing.  In the remaining twenty-three cases, the sentence imposed was probation, without any custodial condition.

Periods of probation varied from three months to five years.  The median term was three years.  Three years also was the mode period (ten of the twenty-seven terms of probation were set at three years.)

---

[2]  Cases were identified through internet searches for media reports.  With the names and jurisdictions identified, PACER searches were conducted.  There may be additional cases which this methodology did not identify.

No fine was imposed in twelve of the twenty-seven judgments.  In the other sixteen, fines ranged from $300 to $15,000. In those cases in which a fine was imposed, the median fine was $1,500.

All the cases involved discharges on the high seas contrary to MARPOL and Oil Record Book (ORB) deficiencies related to the discharges.  A substantial number also involved obstruction of the Coast Guard after investigations began, which appears to have been a significant sentencing factor in five of the six confinement cases, for which factual information is available.  One case stands apart.

In *United States v. Williams*, discussed in subsection B, below, the vessel involved was a United States Coast Guard cutter. Chief Warrant Officer Williams repeatedly bypassed the ship's oil water separator at sea.  In his case, alone among the thirty-three, he also directly discharged bilge water while in port – in Honolulu Harbor.  His indictment alleged that he pumped over the side in Honolulu Harbor for four to five hours, and that approximately 2,000 gallons of bilge water was unlawfully discharged. CWO Williams also made two separate sets of false oral and written statements to Coast Guard investigators during their investigation.  CWO Williams received a sentence which did not include any loss of liberty.

As in any group of cases, the factual details differ. Without access to the presentence reports, and in some instances without PACER access to other ECF filings, we cannot address the guidelines calculations,  guideline variances or other differences among the cases.  Still, given the number of cases in which chief engineers were sentenced in the last five years, we believe the data shows a consistent pattern.  At least where a defendant's conduct was limited to MARPOL-related violations on the high seas,

and did not include obstruction after an investigation commenced, consistently, the sentence imposed was probation without a custodial condition.

A.    For Cases in which Confinement was Ordered, and for which Factual Information is Available, an Apparent Aggravating Factor was Obstruction During a Coast Guard Investigation.

In the cases in which confinement was ordered, and for which factual information is available,[3] there is a pattern of a significant aggravating factor not present in Mr. Pogue's case. In five of the six, the defendant engaged in conduct which obstructed a Coast Guard investigation after it began. The defendants tampered with physical evidence, or tampered with witnesses, or lied to Coast Guard investigators, or some combination of such conduct. We summarize the available information on the ten cases in which confinement was ordered, for the Court's consideration.

1.    United States v. Dimetrios Grifakis, CR 11-11, D. Maryland

Dimetrios Grifakis was the chief engineer aboard the *M/V Capitola*, a 40,437 ton cargo ship. He was indicted for eight violations: obstruction of justice under 18 U.S.C. §§ 1505 and 1515(b) (Count One), 33 U.S.C. § 1908(a) (Count Two), 18 U.S.C. § 1519 (Count Three), witness tampering under 18 U.S.C. § 1512 (Count Four), and making false statements under 18 U.S.C. § 1001 (Counts Five - Eight). ECF No. 1.

---

[3] As noted previously, confinement was ordered in ten cases. Factual information about the defendant's conduct was available in six of them, and the pattern appears in five of those six. In the other four cases, factual information was not available.

Grifakis pled guilty to Count One, a week before trial and after more than three months of litigation.  The government asked the court to impose a sentence of 15 - 21 months. ECF No. 72, at 4. He was sentenced to six months in jail and two years of supervised release. No fine was imposed. ECF No. 70. The sentencing court recommended that the sentence be served in a halfway house.

Grifakis was charged with discharging waste to the sea "using a bypass hose and other [unspecified] means" and falsifying the ship's ORB.  What appeared to set his case apart from others was the nature and extent of his efforts to obstruct the Coast Guard investigation, after it began. He lied repeatedly to the Coast Guard when questioned.  He falsely denied the existence of a sounding log, which he destroyed.  And he "directed" crew members to lie. He also tampered with physical evidence.  The following excerpts are taken from the government's allocution at sentencing.  ECF No. 72.

> He lied to the Coast Guard about how he disposed of the waste from the CAPITOLA. He told them specifically that it was only discharged to shore facilities to barges or disposed of through incineration.
>
> He lied to the Coast Guard about the existence of records that would have assisted them in the investigation.
>
> He lied about the existence of the Daily Sounding Records.

*Id.*, at 4-5.

> The defendant told the Coast Guard point-blank that it [a sounding log] did not exist and provided a written statement in Greek that said essentially the same thing. He then went further and directed all of the engine room crew members to lie to the United States Coast Guard about the existence of that record.

*Id.,* at 13.  According to the indictment,  Grifakis destroyed the sounding log after the Coast Guard investigation began.  ECF No. 1, at 7.  He also tampered with piping aboard the

12

vessel, according to government counsel:

> The defendant's conduct went further, and as he has now acknowledged in his pleadings, involved the tampering with the seawater priming valve, which had been used, or was capable of being used to discharge waste directly through the ship's piping.

ECF No.72, at 13-14.

2.   United States v. Mark Humphries, CR 06-299, D. Maryland

Humphries was charged with conspiracy, two counts of making false statements, four APPS counts and destruction of evidence, according to the docket sheet.   After an eight-day trial, he was sentenced to six months in custody, two years of supervised release, and a fine of $1,000.  ECF No. 121.  None of the court filings other than the docket sheet and judgment are PACER-accessible, and for that reason, we are unable to rehearse the facts of the case.

3.  United States v. Andreas Konstantinidis, CR 11-651, D. Maryland

Andreas Konstantinidis was chief engineer on a brand new bulk carrier ship.  He was charged by Information with one count of violating 18 U.S.C. § 1519.  ECF No. 1.  He pled guilty and was sentenced to three months confinement and one year of supervised release. No fine was imposed.  ECF No. 11.

According to a joint factual statement, ECF No. 7, during the Coast Guard's investigation of the vessel, Konstantinidis made both oral and written false statements to investigators.

4. <u>United States v. Vito LaForgia,</u> CR 12-57, SD Alabama

Vito LaForgia was chief engineer of the *M/V Bottiglieri Challenger*, a 50,321 ton bulk carrier ship.  ECF No. 43, at 2.  LaForgia was indicted for conspiracy to violate 33 U.S.C. § 1908(a) and 18 U.S.C § 1519, two substantive § 1519 counts and one substantive §1908(a) count.  *Id.* After five months of litigation, LaForgia pled guilty to Count Four, alleging a violation of § 1908(a).  He was sentenced to one month in custody and one year of supervised release.  No fine was imposed. ECF No. 184.

The government recommended a sentence of 6 - 12 months custody, and opined that a nine-month sentence would "be imminently [sic] reasonable."  ECF No. 173, at 7. The government's sentencing memorandum asserted that LaForgia engaged in "obstructive conduct," that he made false statements to the Coast Guard during the investigation,  ECF No. 173, at 5-6, and that while the ship was in the Port of Mobile, he acted to conceal physical evidence, as charged in Count Three of the Indictment.  *Id.*, at 7. That count described his alleged conduct as directing a subordinate to "to remove a flange with a connected valve that had been used as part of a bypass system to make overboard discharges of bilge waste from the bilge holding tank and to use the fire hose to rinse out a sounding tube and the bilge holding tank with sea water." ECF 43, at 13.

5. <u>United States v. Camelo Oria</u>, CR08-10274, D. Mass.

 Camelo Oria was chief engineer aboard the *M/T Nautilus*, a 26,794 ton chemical tanker vessel.  In a superseding indictment Camelo Oria was charged with conspiracy to violate 33 U.S.C. § 1908(a), and 18 U.S.C. §§ 1519, 1505 and 1001.  The indictment also charged Oria with substantive violations of §§ 1908(a) and 1001.  The § 1001 count was

for making a false written statement to the Coast Guard during the course of the investigation.  ECF No. 7.

After six months of litigation, Oria pled guilty to the APPS violation.  The agreed statement of facts for his plea addressed his post-inspection obstruction. The vessel was boarded by the Coast Guard, first in St. Croix and again in Boston.  In St. Croix, the Coast Guard found a bypass pipe.  Oria lied to the Coast Guard in St. Croix about the use made of that pipe.  ECF No. 110, at 6.  In Boston, Oria made additional oral and written false statements to the Coast Guard.  *Id.,* at 7.

The indictment also alleged that the ship's sounding log was held by Oria, and was "concealed or destroyed" between the two Coast Guard inspections in St. Croix and Boston.  ECF No. 7, at ¶¶ 26 and 61. The Coast Guard had examined the log in St. Croix, but when requested to produce it in Boston, Oria said "the vessel did not maintain a sounding log."  *Id.,* at ¶¶ 35 and 73.

In its sentencing memorandum, the government asserted that Oria continued to use the bypass pipe for illegal discharge of waste, "only days after a Coast Guard inspection had identified the crossover pipe" in St. Croix.  ECF No. 139, at 2.  It went on to argue that Oria was lying to the sentencing court.

> For the first time, on March 30, 2009 (more than one year after the events in question), in his Objections to the First Presentence Report, Oria offered an elaborate explanation to the Court regarding the March 2008 discharge. [Footnote omitted.] . . . In particular, Oria explained that he "staged an incident" involving the three crew members identified above, because he feared that there was a conspiracy among the vessel's crew to "frame" him and he feared that the "plotters" would fabricate evidence against him.

*Id.*, at 17-18.  It termed "Oria's story [as] extraordinarily elaborate and bizarre," *id.*, at 20,

and called it a "post-plea attempt to foist a wholly bizarre and incredible story on the Court." *Id.*, at 36.

The "government recommend[ed] that the defendant be sentenced to a period of incarceration of ten months, followed by three years supervised release, a fine of $5,000, and a one hundred dollar special assessment." ECF No. 133, at 14. The court sentenced him to one month of confinement, two years of supervised release, and a fine of $3,000. ECF No. 143.

6. United States v. Pangiotis Stamatakis, CR09-130, D New Jersey

Pangiotis Stamatakis was the chief engineer aboard the *M/V Myron N,* a 38,337 ton bulk cargo ship. ECF No.1, at 1-2. An indictment charged him in Count 1 with participation in a conspiracy to: (a) defraud the United States, and (b) to violate 33 U.S.C. § 1908(a) and 18 U.S.C. § 1505. Count 2 alleged an APPS violation. In Counts 3 and 4 he was charged with making a false statement and obstruction of the Coast Guard, in violation of 18 U.S.C. § 1001 and § 1505, respectively.

After four months of litigation, he pled guilty to Count 2, and he was sentenced to three months of probation on condition that he be "confined to a Community Corrections Center, Halfway house for a period of 1 month." No fine was imposed. ECF No. 122.

There is no Pacer-accessible sentencing memo from either party, nor a factual statement for his plea.

7.  United States v. Antonio Rodrigues, CR08-393, SD Texas

Antonio Rodrigues "was the Chief Engineer on board the *M/T Genmar Defiance,*" a 56,225 ton tanker ship.  ECF No. 1, at 3-4.  He was indicted for an APPS violation for entering port with a falsified ORB (count 1), and for violating § 1001 (count 2).

His case went to trial and he was convicted of both counts.  The government asked the court to sentence him to twenty-four months imprisonment on one count and to five years of probation on the other, and to fines totaling $11,500.  ECF No. 312, at 174. He was sentenced to five years probation with a special condition that he "participate in a community treatment center, halfway house or similar facility for a period of three months . . ."  He also was fined $500.  ECF No. 286.


8.  United States v. Payongyut Vongvichianku, CR11-368, SD Alabama

Payongyut Vongvichianku was "the Chief Engineer on the *M/V Gaurav Prem."*  He was indicted for violating 18 U.S.C. §1505 (count one), §1519 (count two), § 1512 (count five), and 33 U.S.C. §1908(a) (count six).  The indictment, ECF No. 31, alleged unlawful discharges of  bilge waste and of garbage containing plastics.  During the course of the Coast Guard investigation, the indictment alleged that Vongvichianku , *inter alia:*

> Directed three subordinate crewmembers to falsely tell the U.S. Coast Guard that a bypass system that had been used to make overboard discharges of oily mixtures, slops from bilges, and bilge waste, was only used in emergencies; . . .

> Presented to the U.S. Coast Guard engine room equipment that had been altered to conceal the use of a bypass system to discharge overboard, oily mixtures, slops from bilges and bilge waste, to wit: a "spool pipe" that connected the bilge and ballast piping to effectuate the bypass system was removed and hidden in the machine shop storage locker.

\*   \*   \*

Directed lower level crew members to conceal the smooth sounding log that recorded the daily levels of the waste oil in the ship's waste oil tanks prior to arriving in Mobile; and . . .

Count Five alleged witness tampering. ". . . after U.S. Coast Guard inspectors discovered a bypass connection for discharging bilge waste overboard on the *M/V Guarav Prem* during a Port State Control vessel examination . . ., the defendant, PAYONGYUT VONGVICH-IANKU, directed approximately three subordinate crew members . . ." to make false statements to the Coast Guard.

After more than five months of litigation, Vongvichianku pled guilty to Count Six, an APPS violation. He was sentenced to one year on probation, with a special condition which read, "The defendant shall participate in the Location Monitoring Program for a period of 180 consecutive days; but credited and satisfied by time served on home confinement thus far." No fine was imposed. ECF No. 312.

9.   United States v. Vassili Samoilenko, CR11-786, ND California

Vassili Samoilenko was chief engineer aboard the *M/V Kostas N,* a 22,000 ton bulk cargo ship. He was charged by Information with two counts of violating 18 U.S.C. § 1519. ECF No. 1. He pled guilty to both counts. Samoilenko was "sentenced to probation for a term of three (3) years non-supervised and the condition of home confinement with credit for time served from 8/11/2011 to 11/14/2011." ECF No. 18, at 2. That was the sentence recommended by the government, which also asked the Court to grant him a four-point guidelines adjustment for cooperation. ECF No. 8. The PACER-accessible information does not indicate that he engaged in obstruction after the investigation began.

18

10.  <u>United States v. Vadym Tumakov, CR08-10253, D. Massachusetts</u>

Vadym Tumakov was charged by Information with two APPS counts.  He was chief

engineer aboard the *M/V Nautilus.* ECF No. 1. He agreed to plead guilty to both counts and

the plea agreement said that the government did not contemplate a §5K1.1 motion, but left

open the possibility.  It did not contain a factual statement.  He was sentenced to one week

in custody.  ECF No. 17, at 2.

B.  <u>In Five Other Cases, No Confinement was Ordered Although the Defendant
Engaged in Obstruction after a Coast Guard Investigation Began.</u>

In five other cases for which factual information is available, the sentence imposed

did not include confinement, although the defendant engaged in obstruction of the Coast

Guard after it began an investigation.

1.  <u>United States v. Dimitrios Dimitrakis</u>, CR 10-552, ND Cal.

Dimitrios Dimitrakis was chief engineer on the *M/V New Fortune*, a 26,136 ton bulk

carrier. ECF No. 1, at 7-8.  According to the government's sentencing memorandum, ECF

No. 30, at 4, ". . . to further hide his conduct from the authorities, he lied and also told his

subordinates to lie to the United States Coast Guard about how oil-containing wastes from

the ship had been disposed." ". . . five crew members reported having conversations with

the Defendant in which he instructed them not to tell the Coast Guard about the discharges

through the hose and gave instructions on what lies to tell the Coast Guard about the

disposal of machinery space waste if asked. . . .  The information they were instructed to

19

give was consistent with the false entries in the Oil Record Book and with the verbal false statements that the Defendant . . . made to the Coast Guard."

The government asked the court to "sentence Defendant Dimitrakis to a period of six months imprisonment and a fine of $20,000." ECF No. 30, at 21. The sentence imposed was three years of probation and a $5,000 fine.  ECF No. 36.

   2.  United States v. Romulo Esperas, CR11-263, ED La.

Romulo Esperas was charged by Information with conspiring to violate 18 U.S.C. § 1519. Espera was chief engineer aboard the *M/V Agios Emilianos*, a 36,573 ton bulk carrier.  ECF No. 1.  According to the factual statement for his guilty plea, in addition to violating APPS, Esperas falsely denied the existence of a sounding log which "was truthful and would contradict the information contained in the vessel's Oil Record Books." Then, he "destroyed the sounding log by burning it in his cabin."  ECF No. 14, at 5.

Esperas was sentenced to three years of probation and no fine.  ECF No. 29.

   3.    United States v. Rudolf Hofer, CR 12-458, SD Texas

Rudolf Hofer was the "Chief Engineer of the *M/V Susan K*," a "3642 -ton ocean-going general cargo vessel." He was charged in a single-count information with failing to maintain an ORB, in violation of 33 U.S.C. § 1908(a).  ECF No. 1.

His plea agreement contained a cooperation provision, in which the government agreed to move for -1 point in his guideline calculation.  ECF No. 22.  The agreed factual statement for his plea, ECF No. 23, at 3, reported that he " . . . repeatedly discharged oily bilge water from machinery spaces on board the Susan K directly overboard into the sea

. . .," that he lied when questioned by the Coast Guard, and instructed an oiler to lie.

Hofer was sentenced to one year of probation and fined $1,000.  ECF No. 26.


4.  <u>United States v. Triantafyllos Marmaras</u>, CR10-248, D Maryland

Triantafyllos Marmaras was charged by Information, alleging that he was chief engineer of the *M/V Iorana*, a 40,170 ton bulk cargo ship.  ECF No. 1.  He was charged with and pled guilty to three counts: obstruction of an agency proceeding (18 U.S.C. § 1505), falsification of the ship's ORB (18 U.S.C. § 1519); and making false statements (18 U.S.C. § 1001).

The agreed factual statement, ECF No. 6-1, addressed "obstructive conduct" after the Coast Guard learned that a bypass pipe was used.

> For example, the Coast Guard interviewed witnesses in a room adjacent to the Master's office. The Master and Marrnaras spoke to several witnesses immediately prior to their interview. During these conversations, the Electrician and a Wiper were told not to tell the Coast Guard about the bypassing and to say that the bypass hose and flanges came from the Chinese shipyard. Marmaras also met with the Second Engineer and Third Engineer in the engine control room and gave them similar commands. Marmaras also told a crew member to hide a cup holding the oil that was leaking from the boiler pump to avoid detection should the Coast Guard decide to inspect that area of the ship.
>
> . . . During the Coast Guard inspection, Marmaras was asked to prepare a written statement. Marmaras prepared a false and misleading statement in the presence of and with the participation of the Master. Marmaras and the Master discllssed what Marmaras should write before Marmaras wrote anything. As Marmaras wrote the statement he read it out loud to the Master. Marmaras' statement falsely indicated thot the bypass hose and connections came from the Chinese shipyard. In making this statement, Marmaras intended to supply a false, innocent explanation for the existence of the bypass. . .

The docket sheet shows no sentencing memorandum from either party.  Marmaras was

sentenced to five years of probation on each of three counts, with a  special condition barring him from sailing on any ship "coming to the United States." A $5,000 fine was imposed.  ECF No. 14.


5.  United States v. David G. Williams, CR07-376, D Hawaii

David G. Williams was indicted for violating 18 U.S.C. §§ 1505 and 1001.  Williams was a Coast Guard Chief Warrant Officer, assigned to the Coast Guard Cutter *Rush*.  The indictment described him as the "Engineering Department's Main Propulsion Assistant," who "was responsible for the maintenance and upkeep of the main diesel engines and other machinery in the RUSH's engine room."  ECF No. 1, at 2.

The indictment alleged that Williams caused bilge waste to be discharged, using a pneumatic pump and rubber hoses, while on the high seas.  *Id.*, at 3.  It also alleged that he directed that the ship's aft bilges be pumped into Honolulu Harbor for four to five hours, using a pneumatic pump.  An anonymous complainant said 2,000 gallons were pumped into the harbor.  *Id.*, at 5.

During the criminal investigation, Williams made a false oral statement and a false written statement to investigators. *Id.*, at 6.  Then he changed his story, both orally and in writing, both of which also were alleged to be false. *Id.*, at 7.

Williams pled guilty to count two. There is no sentencing memorandum on the docket sheet. He was sentenced to two years of probation with 200 hours of community service, and a $5,000 fine.  ECF No. 21.

C.    Significantly, in Section 3553(a)(6), Congress Directed that Courts Focus on "Similar Conduct" Rather than on the Offense of Conviction, and on National Sentencing Patterns.

Title 18 U.S.C. § 3553(a)(6) "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501 F.3d 620, 623-624 (6th Cir. 2007). *See also, United States v. Pisman*, 443 F.3d 912, 916 (7th Cir. 2006) (". . . concern with sentence disparity is not one that focuses on differences among defendants in an individual case, but rather is concerned with unjustified difference across judges or districts . . .).  In the last five years, thirty-three chief engineers have been sentenced, in twelve Districts along all three coasts, in cases which included conduct similar to that of which Mr. Pogue was found guilty.  That number of cases and the geographical distribution is large enough[4], we believe, to create a cognizable national pattern.

The longest sentence imposed on any chief engineer in the last five years is six months, and a sentence of that length was imposed in only three of thirty-three cases.  In two of the three, *United States v. Grifakis* and *United States v. Vongvichianku,* documents in the public record clearly show that the defendants engaged in obstruction of justice during a Coast Guard investigation of the underlying MARPOL violations, including lying to the Coast Guard when questioned, suborning false statements by subordinates to the Coast Guard, and in Grifakis' case, tampering with physical evidence.  In the third case,

---

[4] We note that the Court of Appeals has not determined a minimum number of cases or Districts which will be sufficient, but did conclude, "Without more, two allegedly similar cases [in the same District] constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."  *United States v. Accardi*, 669 F.3d 340 (D.C. Cir. 2012)

*United States v. Humphries*, the docket sheet shows that he was charged with destruction of evidence, but the publicly available information offers no details about the scope of his obstructive conduct.  Mr. Humphries, as Mr. Pogue, was tried and found guilty by a jury.

Others who engaged in obstruction after a Coast Guard investigation began, either received lesser custodial sentences (Camelo Oria and Vito LaForgia (one month) and Andreas Konstantidis (three months)), or no confinement (Dimitrios Dimitrakis, Romulo Esperas, Rudolf Hofer, Triantafyllos Marmaras, and David Williams).  In contrast, those defendants whose conduct was limited to MARPOL-ORB activity, almost always received probation without confinement.  We respectfully submit that the national sentencing pattern for chief engineers found guilty of similar conduct warrants imposition of a sentence of probation for Mr. Pogue, without confinement.

## IV.    SECTION 3553(a)(4)(A) – THE SENTENCING GUIDELINES

### A.    Factors Which Warrant a Sentence Below the Calculated Offense Level

As detailed in section II.B., above, Mr. Pogue is the sole caregiver for his mother. His mother is no longer able to live alone.  To care for her, Mr. Pogue returned home before the instant investigation began, and has remained with her since then.  Her needs and his care, we believe, meet the requirements of USSG §5H1.6, Application Note 1(B), and also is a proper basis for a reduced sentence under 18 U.S.C. § 3553(a).  *See, e.g., United States v. Dominguez,* 296 F.3d 192 (3d Cir. 2002).

Although Mr. Pogue has a brother and sister, neither is able to care for their mother. Mr. Pogue's sister has suffered a stroke.  His brother cannot relocate to Idaho to be a caregiver, and he has no room for her where he lives.

24

Second, Mr. Pogue faces an extraordinary collateral consequence of his conviction. As reflected in Exhibit 15, received notice that based on his "recent criminal conviction, the U.S. Coast Guard intends to seek revocation of Mr. Pogue's officer endorsement . . ." Its notice relied upon 46 U.S.C. § 7703, which in relevant part provides:

> A license, certificate of registry, or merchant mariner's document issued by the Secretary may be suspended or revoked if the holder—
>
> *   *   *
>
> (2) is convicted of an offense that would prevent the issuance or renewal of a license, certificate of registry, or merchant mariner's document; . . .

The loss of his mariner's license will preclude Mr. Pogue from working in the only occupation he has had since he left high school.

Although he planned to remain at home to care for his mother, it has been his intention to return to sea when his caregiver role ends. Without his license, he cannot do so. Such employment collateral consequences have been a basis for sentences imposed below the guidelines. *See, e.g., United States v. Ranum*, 353 F. Supp. 2d 984, 991 (E.D. Wis. 2005) ("As a result of the conviction he lost that job and will be unable to work in banking again.").

Third, use of USSG § 2J1.1 creates "guideline inflation." The guidelines draw a clear distinction between obstruction of justice involving proceedings and obstruction of federal regulatory records-keeping rules. The former is addressed in Chapter 2, Part J of the guidelines, which addresses "offenses involving the administration of justice" and in §3C1.1   The notes to both sections make clear the Sentencing Commission's view of the scope of conduct addressed:

> *This section addresses offenses involving the obstruction of justice generally*

> *prosecuted under the above-referenced statutory provisions. Numerous offenses of varying seriousness may constitute obstruction of justice: using threats or force to intimidate or influence a juror or federal officer; obstructing a civil or administrative proceeding; stealing or altering court records; unlawfully intercepting grand jury deliberations; obstructing a criminal investigation; obstructing a state or local investigation of illegal gambling; using intimidation or force to influence testimony, alter evidence, evade legal process, or obstruct the communication of a judge or law enforcement officer; or causing a witness bodily injury or property damage in retaliation for providing testimony, information or evidence in a federal proceeding. The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence.*

Similarly, in §3C1.1, Application Note 4 identifies types of conduct deemed to obstruct the administration of justice.  In contrast, USSG § 2E5.3 addresses "False Statements and Concealment of Facts in Relation to Documents" required to be made and maintained under several federal regulatory schemes, including "destruction and failure to maintain corporate audit records."

Title 18 U.S.C. § 1519 was part of the Sarbanes-Oxley Act, which created duties of creation and retention of corporate audit records and created criminal penalties for those who failed in the duties.  The Sentencing Commission does not appear to have distinguished between the two kinds of conduct which fall within § 1519: that which is classic obstruction of justice, as described in §§ 3C1.1 and 2J1.2, and that which is akin to § 2E5.3 The base offense level is 6 under § 2E5.3, compared with 14 under 2J1.2.  Use of § 2J1.2 in Mr. Pogue's case inflates the guidelines score for conduct which is not within the scope of the Background Note, and which comports with conduct treated with less severity under § 2E5.3.

Similarly, the use of § 2J1.2 rather than § 2Q1.3 increases the base offense level to 14 from 6 points, when the relevant conduct is precisely the same for both counts.  Here,

unlike a number of other prosecutions discussed in Section III, above, there was no allegation or proof that Mr. Pogue engaged in conduct different in any way under Count Two and Count Three.   As the Court may recall, we raised this issue before trial unsuccessfully.  In its order, ECF No. 132, at 32, the Court stated:

> While the defendants are required to assert their argument that charges in the Superseding Indictment are multiplicitous through pre-trial motion, see FED. R. CRIM. P. 12(b)(3)(B), "multiplicity claims are better sorted out post-trial." *Hubbell*, 177 F.3d at 14. The primary evil of multiplicitous charges is that a defendant will be punished twice for the same offense. This harm, if it exists at all, may be remedied during the sentencing phase if the jury returns a conviction on all counts of the Superseding Indictment.

Our argument for sentencing purposes is slightly different, and is based on basic Sentencing Commission tenets of looking to the defendant's actual conduct rather than the charge or number of charges brought, which it referred to as "count manipulation."  The conduct for which Mr. Pogue was convicted should be treated in the same manner as under § 2Q1.3 or § 2E5.3, *i.e.*, as conduct with a base offense level of 6 rather than 14.

B.     Objections to Enhancement under § 2J1.3(b)(3) and §3B1.1(c)

The Probation Office calculated Mr. Pogue's offense level to include a two-point enhancement under § 2J1.3(b)(3) and another two-point enhancement under § 2C1.1. We believe neither enhancement should be applied.  Our objections to both were made to the Probation Office, as required.

1.     *The Two-Point Enhancement under § 2J1.3(b)(3) Should Not Be Applied, for Three Reasons.*

The Probation Office assessed the two points based on each of the three subsections.  We believe none is applicable to Mr. Pogue. Subsection (3)(A) is inapplicable,

because it requires "destruction, alteration, or fabrication of <u>substantial number</u> of records, documents, or tangible objects." (Emphasis added.) Previously the Court construed Count Three as charging that the defendants made multiple false entries in a single record. ECF No. 132, at 22, emphasis added:

> In this case, the Court agrees with the government that Counts Three and Five charge multiple ways of violating the statute by a number of means in an ongoing scheme, which is permissible. The defendants are alleged to have engaged in routine and repetitive illegal discharges of bilge waste during fishing voyages that ended in American Samoa. The Superseding Indictment charges the defendants with making false entries in the ORB, which was part of an ongoing scheme to conceal their illegal acts. <u>Given this continuing course of conduct, the government may properly charge repeated false entries in the same document in a single count.</u>

The Probation Office agreed with the Court's view that there was a single document, but took the additional view, that "while there was a single document, the ship's Oil Record Book, the multiple fraudulent entries account for more than one record." Presentence Report, at 26. We believe that view is inconsistent with the guideline, which increases the offense severity for multiple documents, not multiple omissions or falsifications in the same document.

Second, subsection (3)(C) is inapplicable, because it requires conduct "extensive in scope, planning, or preparation." The report does not indicate whether the enhancement was applied upon a finding of scope or planning or preparation. It appears that the only one potentially applicable is scope, for the act required neither preparation nor planning. If, as we assume, the finding of scope is based on the allegation (rejected by the jury) that Mr. Pogue engaged in a years-long conspiracy, the enhancement is inapplicable, because "scope" does not mean "duration." *United States v. Newman*, 614 F.3d 1232, 1239 (11th Cir. 2010).

Both our case law and  other provisions of the sentencing guidelines distinguish between the duration and scope of criminal offenses. For example, § 2B1.1, which applies to theft, fraud, and property offenses, directs the district court to "make a reasonable estimate of the loss" caused by the offense. U.S.S.G. § 2B1.1 cmt. n.3(C). In making this estimate, the guidelines instruct the district court to consider "available information . . . as appropriate and practicable under the circumstances" including "general factors, such as the *scope and duration of the offense*." *Id.* (emphasis added). The Commission's decision to include consideration of both the "scope" and "duration" of the offense under § 2B1.1, while at the same time omitting any consideration of the "duration" of the offense from § 2J1.2(b)(3)(C), is significant. This is so because identical terms in different guidelines are generally presumed to have the same meaning in both provisions, and the disparate inclusion or exclusion of language is presumed to be intentional and purposeful. *See United States v. Perez*, 366 F.3d 1178, 1182-83 (11th Cir. 2004) (collecting cases). We therefore presume that the Commission said what it meant and meant what  it said when it omitted the duration of the offense from consideration under § 2J1.2(b)(3)(C).

Third, subsection (3)(B) provides for an enhancement if the falsified record is an "essential or especially probative record."  The Presentence Report assessed that enhancement because, "The law required that the Oil Record Book be maintained onboard a vessel for at least three years, and available for inspection with a presumption that the entries in the Book were accurate."  While that statement may be correct, the fact that a record was required to be accurately made and maintained in the ordinary course of business does not make it *per se* essential or especially probative.  The guideline, its notes and comments do not define or describe when a record is "essential or especially probative," but we think it likely that if the Commission meant any required record, it would have said that.  Rather it seems to have imposed a higher standard, without definition or guiding comment.

2.    *The Leadership Role Enhancement is Inapplicable to Mr. Pogue.*

Under USSG § 3B1.1(c), the Probation Office increased Mr. Pogue's offense level by two points for a leadership role. We disagree. The offenses with which Mr. Pogue was charged and the counts on which he will be sentenced involve his keeping of the ship's Oil Record Book. In making entries in the ORB, Mr. Pogue acted alone. No witness testified, or said out of court, that he participated with Mr. Pogue in making ORB entries. Because the offenses were "single actor" offenses, no adjustment is appropriate. USSG § 2B1.1, Application Note 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.")

The Probation Office view is that "relevant conduct" for sentencing purposes includes MARPOL violations which occurred outside the United States and that Mr. Pogue was a leader or organizer in those violations. We believe that alleged pollution occurring outside the United States may not be considered as relevant conduct under *United States v. Abrogar*, 459 F.3d 430 (3rd Cir. 2006). As this Court previously read that decision, ECF No. 171, at 7:

> The issue in *Abrogar* was whether the district court had properly applied a six-level sentencing enhancement, pursuant to § 2Q1.3 of the United States Sentencing Guidelines, for repeated discharges of pollutants into the environment. *See Abrogar*, 459 F.3d at 431. The district court had imposed the six-level enhancement—even though the defendant had been charged with ORB recordkeeping violations rather than actual illegal discharges—because it found that the illegal discharges were "relevant conduct" for purposes of determining the total offense level under the Guidelines. *See id.* at 433; see also U.S. Sentencing Guidelines Manual § 1B1.1 cmt. 1(H) (2011) (defining "offense" as "the offense of conviction and all relevant conduct"). The Third Circuit disagreed, holding that improper discharges are not "relevant conduct" under the Sentencing Guidelines. *Abrogar*, 459 F.3d at 435-36.

Second, we note that the "role" enhancement was not added to codefendant Vano's guideline score, according to the Presentence Report. As the Court heard, the role which

Mr. Vano and Mr. Pogue played as chief engineer was identical in all respects – same vessel, same number of crewmen, and the same duties.  In the Presentence Report, at 26, the Probation Office stated two bases for enhancing Mr. Pogue's sentence but not Mr. Vano's.  First, it noted, "Sanford Ltd., counsel requested that the portions of the report which make reference to codefendant Ong Vano, name him as the 'Relief Chief Engineer,' making the distinction between him and defendant Pogue."  For whatever reason Sanford, Ltd., may have had, it is (a) not binding on Mr. Pogue and (b) says nothing about the role of the individual.  The Court heard Mr. Vano and knows that his role was identical to Mr. Pogue's when each was at sea.

Second, the Probation Office based its distinction on unspecified witness reports:

> When interviewing some of the crew members, the investigators determined that the crewmembers pumped the waste water overboard without using the requisite equipment at the direction of defendant Pogue. The investigators were not advised that defendant Ong Vano was the person in authority who encouraged this criminal conduct. Based on the aforementioned, an aggravated role adjustment is warranted as to defendant Pogue solely.

ECF No. 221, at 26. That statement is incorrect. Before trial, crewmembers told investigators and the grand jury that Ong Vano  directed overboard discharges.  They also so testified at trial.

<u>Silverio Distor</u>

A Coast Guard interview memo of July 26, 2011, Exhibit 16 reported that Silverio Distor advised:

> Approximately three times a week at about 0800 hours, he and Chief Engineer (CIE) Rolando Cortes ONG VARO [sic], F/V SAN NIKUNAU, would transfer oily water waste from the engine room bilge to pipe alley. They would use a process known to him as decanting. They would draw suction from the bottom of the engine room bilge and pump only the water under the layer of oil into pipe alley. The water in pipe alley would be pump directly overboard . . ."

In his grand jury testimony, on November 1, 2011, he testified, at page 8 of the transcript,

Exhibit 17:

> Q And the same thing with Mr. Vano; he was the Chief Engineer and in charge of the engine room?
>
> A Yes.
>
> Q Did he ever instruct you to pump out the oily bilge waste?
>
> A Yes.

At trial, Silverio Distor testified, with regard to Mr. Vano:

> A. I would follow his instructions.
>
> Q. What were his instructions?
>
> A. To pump the water outside.
>
> Q. To pump the water outside using what system?
>
> A. By using the bilge pump.

Transcript, at 10-11, Exhibit 18.[5]

<u>Rhyme Distor</u>

In his grand jury testimony, on November 1, 2011, Rhyme Distor testified:

Q Okay. Now you -- the last Chief Engineer, what was his name?

A Ong Vano. Ong Vano.

*   *   *

Q And he was the Chief Engineer you were with. Did he ever order you to discharge the engine room bilges?

---

[5] A copy of the transcript was provided to the Probation Office along with Mr. Ogue's objections to the draft report.

Yes. Yes. He ordered me.

Okay. He ordered you back in 2008 to do it?

Yes. Yes, sir.

And again in 2011?

Yes.

Transcript at 15-16, Exhibit 19.

<u>Donato Eulactic</u>

When interviewed by the Coast Guard in American Samoa on July 24, 2011, Eulactic

advised investigators:

Both C/E ONG VANO and 1/E Silverio DISTOR pump [sic] the engine room bilge contents into the pipe alley. After the oily water from the engine room was transferred to pipe alley, it was pumped directly overboard. This discharge was always completed at night. EULATIC has assisted both C/E ONG V ANO and 1/E Silverio DISTOR transfer the oily water waste generated from the engine room to pipe alley and then overboard.

Exhibit 20.  Interviewed again on October 28, he told government counsel and investigators:

He could recall being ordered by Mr. Rolando Cortes ONG VANO, Chief Engineer, F/V SAN NIKUNAU, to pump overboard on three occasions during the last voyage.

Exhibit 21. In his grand jury testimony, on November 1, 2011, he testified:

Q Okay. And did Chief Engineer Vano, ever tell you to pump out the bilges?

A Yes.

Transcript, at 10, Exhibit 22.  It is clear that the bases for the Probation Office's distinction

is flawed, both legally under *Abrogar* and factually.

## V.  SECTION 3553(a)(2) – NEED FOR THE SENTENCE TO REFLECT SERIOUSNESS OF THE OFFENSE AND PROVIDE DETERRENCE

33

"Section 3553(a), for instance, does not require the goal of general deterrence be met through a period of incarceration."  *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010).  The legislative history of the Sentencing Reform Act, S. Rep. No. 98-225, at 92, included the statement, "This is not meant to imply that the Committee considers a sentence of imprisonment to be the only form of sentence that may effectively carry deterrent or punitive weight. It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose." [Footnote omitted].

In sentencing thirty-three chief engineers in other cases, courts concluded that the sentences they imposed were consistent with the statutory mandates of §3553(a), and in two-thirds of the cases, they did not impose confinement.  In no case was confinement was ordered for more than six months, although the government argued vigorously for longer sentences, in the interests of general deterrence.

For example, in *United States v. Dimitrakis,* CR10-552 ND Cal., the government asked for a six-month sentence and a $20,000 fine, arguing, "If seafarers, like Defendant Dimitrakis, see jail time as a real possibility if caught falsifying an Oil Record Book, it will reduce their incentive to take the 'easy way out' on the job – dumping oily wastes to avoid losing valuable time to faulty or inefficient equipment and shore-side disposal procedures – and to collude with their employers to assist them in gaining an unfair advantage over competitors."  ECF No. 30, at 21.  The court sentenced Dimitrakis to three years of probation and a $5,000 fine.  No confinement was  ordered.  ECF No. 36.

In *United States v. LaForgia*, CR12-57, SD Alabama, the government asked the court to impose a six to twelve-month sentence. ECF No. 173, at 15. It argued, in part, "A strong

deterrence message is necessary not only to address the serious nature of the defendant's criminal conduct, but also because environmental crimes are so inherently difficult to detect." *Id.,* at 11.  It also noted LaForgia's "many other acts of deliberate concealment in this case during the conspiracy.  Aside from the deliberate omissions of required information from the Oil Record book . . ." *Id.*  The court found a sentence of one month and no fine was appropriate.

In *United States v. Oria*, CR08-10274, D. Mass., the government asked for a sentence of ten months confinement and a fine of $5,000.  ECF No. 133, at 14.  It argued, "It is imperative that the Court's sentence send a strong deterrent message to the maritime community that contaminating the ocean with oil will not be tolerated. A strong deterrence message is necessary not only to address the serious nature of the defendant's criminal conduct, but also because environmental crimes are so inherently difficult to detect." *Id.*, at 6.  It argued also, that Oria's obstruction of the Coast Guard investigation was "an affront to the integrity of the criminal justice system," *id.,* at 7, and that "there is a particular need for the sentence in this case to send a message that this type of response to a duly authorized government investigation will not be tolerated." *Id.,* at 8.  The court sentenced Oria to one month in jail and a $3,000 fine.

Even when the defendant was a Chief Warrant Officer in the United States Coast Guard, the sentence imposed did not include confinement. *United States v. Williams*, CR07-376, D Hawaii.  Looking at the sentences imposed on chief engineers in the last five years, courts have concluded consistently that the deterrence factor, strenuously argued by the government, did not require custodial sentences at all or did not require sentences of the length sought by the government, even where there was obstruction of the Coast Guard's

investigations.

A sentence consistent with those imposed on others in the last five years will not alter the deterrence equation.  However, in this case there is a substantial additional element of deterrence, arising from the Coast Guard's intention to strip Mr. Pogue of his license, and with it, his career and livelihood.


VI.    **CONCLUSION**

For the foregoing reasons, we submit that a sentence of probation and a $5,000 fine, without imprisonment or community confinement is sufficient but not greater than necessary to satisfy § 3553(a).


Dated:  December 28, 2012


Respectfully submitted:

s/ Irwin H. Schwartz

_____
Irwin H. Schwartz
Attorney for James Pogue


s/ Carmen D. Hernandez

_____
Carmen D. Hernandez
Attorney for James Pogue


36

**Certificate of Service**

I certify that on this date, I electronically filed the foregoing document with the

Clerk of the District Court for the District of Columbia using the CM/ECF system, which

will cause it to be served on counsel of record:

> AUSA Frederick Walton Yette Kenneth E. Nelson
> U.S. Attorney's Office
> 555 Fourth Street,
> Washington, D.C. 20531-0001
> Frederick.Yette@usdoj.gov
> (202)252-7733
>
> Kenneth E. Nelson
> Environmental Crime Section, Department of Justice
> 601 D Street, NW, Suite 2814
> Washington, D.C. 20004
> Kenneth.Nelson3 @usdoj.gov
> (202)305-0435
>
> Gregory F. Linsin, Esq.
> Blank Rome LLP
> 600 New Hampshire Ave., N.W.
> Washington, D.C. 20037
> (202)772-5800
> Linsin@blankrome.com
>
> Michael G. Chalos
> Brian T. McCarthy
> Chalos, O'connor LLP
> 366 Main Street
> Port Washington, NY 11050
> (516)767-3600
> mchalos@codus-law.com
> bmccarthy@codus-law.com

Dated:  December 28, 2012

s/ Irwin H. Schwartz

_____

Irwin H. Schwartz